Case: 1:07-cv-03540 Document #: 235-1 Filed: 01/04/13 Page 1 of 5 PageID #:1298
Case: 12-3927   Document: 00711911960   Filed: 01/04/2013   Pages: 56
Get a Document - by Citation - 396 Ill. App. 3d 833
Page 6 of 7

Esang had been restored to fitness appeared to be based solely upon his stipulation to psychiatric conclusions that he was fit to stand trial. "To accept defendant's opinion that he is able to co-operate with counsel in his defense, when the purpose of the hearing is to determine that very fact, would make a sham out of the sanity hearing." People v. McKinstray, 30 Ill. 2d 611, 616-17, 198 N.E.2d 829 (1964). Esang's stipulation was especially unreliable in light of the medical evaluation's report, confirmed by Esang himself, that he had refused all psychotropic treatment, thereby suggesting that his medical condition was minimally changed from the time of the earlier finding that he was unfit.

*HN2* A trial court's failure to independently analyze and weigh expert testimony in making a fitness finding is a constitutional error, properly considered **[\*\*\*14]** under the plain error doctrine and reversible unless it can be proved to be harmless beyond a reasonable doubt. People v. Contorno, 322 Ill. App. 3d at 179-80. Given the trial court's clear doubt about Esang's fitness to stand trial both before and after the March 2007 restoration determination, we cannot conclude that the insufficient fitness restoration hearing in the instant case was harmless beyond a reasonable doubt. Accordingly, we reject the State's contention that Esang has waived review of the issue by failing to raise it at trial and in a posttrial motion.

The State suggests that even if Esang's restoration hearing was inadequate, the proper remedy is a retrospective fitness hearing rather than a new trial. We are unpersuaded by this contention. *HN3* Although in "exceptional cases," retrospective fitness hearings may accurately discern the mental state of a defendant during a trial held many years earlier, retrospective hearings "will normally be inadequate to protect a defendant's due process rights when more than a year has passed since the original trial and sentencing." People v. Neal, 179 Ill. 2d 541, 553-54, 689 N.E.2d 1040, 228 Ill. Dec. 619 (1997). Our supreme court found such "exceptional" circumstances **[\*\*\*15]** to be present in Neal, where the defendant asserted not that he suffered from a long-standing condition that rendered him unfit, but that he was rendered unfit by the use of specific psychotropic drugs used at the time of his trial. 179 Ill. 2d at 545-46. The Neal court found that long after any individual use of the drugs in question, medical experts could establish that, when taken in known doses, they would not have caused impairment sufficient to render the defendant unfit to stand trial. "If the chemical properties of medication are such that their effects could accurately be assessed in light of a defendant's known medical history, * * * it would not matter whether **[\*841]** the evaluation followed the original trial and sentencing by 15 days or 15 years. The result would be the same." Neal 179 Ill. 2d at 554.

Doubt regarding Esang's fitness for trial in the instant case was noted by the court a full year prior to the fitness restoration hearing, and was not asserted to have been produced by any specific prescription of medication. Since Esang's condition was not alleged to have been produced by a single, easily identified and readily assessed factor, and since his documented **[\*\*572]** lack of cooperation **[\*\*\*16]** with medical personnel limited the extent of his evaluations, we do not believe that the instant case presents the exceptional circumstance that would enable an accurate judgment of his mental state more than two years after his trial. We therefore conclude that the general principle stated by the Neal court must prevail here, and that the inadequacy of Esang's restoration hearing requires reversal of his convictions and sentences.

Esang also contends that despite his assertion of his right to represent himself, the court committed reversible error in failing to appoint counsel to represent him or, at minimum, to act as standby counsel. *HN4* Where a *bona fide* doubt exists as to a defendant's competency to stand trial, that defendant cannot intelligently waive his constitutional right to representation by counsel, and permitting him to represent himself is reversible error. People v. Rath, 121 Ill. App. 3d 548, 550-51, 459 N.E.2d 1134, 77 Ill. Dec. 38 (1984).

In the instant case, Esang's in-court conduct, though exhibiting familiarity with the charges against him and the nature of the court proceedings, was sufficiently troubling to the court to prompt it to order, *sua sponte*, two additional medical examinations after the **[\*\*\*17]** original examination requested by his counsel. We believe that the trial court's repeated and explicit expressions of concern regarding Esang's mental state demonstrated the existence of *a bona fide* doubt regarding his competency, and that in the presence of such doubt, Esang's waiver of

that the inadequacy of Esang's restoration hearing requires reversal of his convictions and sentences.

Esang also contends that despite his assertion of his right to represent himself, the court committed reversible error in failing to appoint counsel to represent him or, at minimum, to act as standby counsel. **HN4** Where a *bona fide* doubt exists as to a defendant's competency to stand trial, that defendant cannot intelligently waive his constitutional right to representation by counsel, and permitting him to represent himself is reversible error. People v. Rath, 121 Ill. App. 3d 548, 550-51, 459 N.E.2d 1134, 77 Ill. Dec. 38 (1984).

In the instant case, Esang's in-court conduct, though exhibiting familiarity with the charges against him and the nature of the court proceedings, was sufficiently troubling to the court to prompt it to order, *sua sponte*, two additional medical examinations after the [***17] original examination requested by his counsel. We believe that the trial court's repeated and explicit expressions of concern regarding Esang's mental state demonstrated the existence of *a bona fide* doubt regarding his competency, and that in the presence of such doubt, Esang's waiver of his right to counsel cannot be held to have been intelligently made.

We also note that since Esang's trial, the United States Supreme Court has shed additional light on a court's ability to strike a balance between a defendant's right to determine the course of his own defense and the desire, readily apparent in the trial court's conduct here, to protect that defendant from the consequences of an unsound decision to represent himself. It has now explicitly been held that **HN5** a defendant may be competent to stand trial while at the same time incompetent to represent himself, and that in such circumstances, he suffers no constitutional injury from a trial court's refusal to permit him to represent himself. Indiana v. Edwards, 554 U.S. 164, 171 L. Ed. 2d 345, 128 S. Ct. 2379 (2008).

[*842] CONCLUSION

For the foregoing reasons, we reverse Esang's convictions and sentences and remand to the circuit court of Cook County [***18] for proceedings consistent with this opinion.

Case: 1:07-cv-03540 Document #: 235-1 Filed: 01/04/13 Page 3 of 5 PageID #:1300
Case: 12-3927    Document: 00711911960    Filed: 01/04/2013    Pages: 56
Get a Document - by Citation - 396 Ill. App. 3d 833                                    Page 7 of 7

Reversed and remanded.

QUINN ▾ and STEELE ▾, JJ., concur.

    Service: **Get by LEXSEE®**
    Citation: **396 ill app 3d 833**
      View: Full
Date/Time: Thursday, March 22, 2012 - 9:41 AM EDT

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- [Q] - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- (A) - Citing Refs. With Analysis Available
- (I) - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

In    About LexisNexis | Privacy Policy | Terms & Conditions | Contact Us
Copyright © 2012 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



DECEMBER 15, 2012 // NEWS

# Sister: Man killed by Taser had 'breakdown'

## But she says police treated him 'like an insect'

BY DAN ROZEK AND FRAN SPIELMAN
Staff Reporters

Philip Coleman had a "breakdown" that caused him to act erratically and prompted his arrest but he "didn't deserve to die," his older sister said Friday.

The 38-year-old Coleman, a businessman and University of Chicago graduate, died a day earlier after twice being Tasered by Chicago Police following his arrest for allegedly beating his mother.

"He was not treated justly, he was treated like an insect," said his older sister, Jacqueline Coleman, Friday outside her parents' Far South Side home. "This was not right."

Philip Coleman's death at Roseland Community Hospital followed a string of unusual events that began Wednesday night when he was arrested by Chicago Police after allegedly attacking his 69-year-old mother at her West Pullman home.

Coleman, who stood about 6-feet 2-inches tall, struggled with officers and spit blood at them while being arrested, police said.

While he was being taken to court Thursday morning, Coleman allegedly again became combative and was shocked with a Taser, police said.

Coleman was taken to Roseland Hospital around 8:30 a.m., where during his treatment he struggled with police — who again used a Taser to try to subdue him, Chicago Police said.

Medical workers then gave him a sedative, "which is protocol at Roseland" hospital


Jacqueline Coleman talks about her brother on Friday. | RICH HEIN–SUN-TIMES


Philip Coleman, 38, who was combative with police at a South Side lockup, died Thursday after he was Tasered twice.

president Dian Powell said in a statement.

Coleman was pronounced dead at the hospital at 5:37 p.m., according to the medical examiner's office.

Following a Friday autopsy, Coleman's death remained under investigation, according to the medical examiner.

But Coleman's father, Percy Coleman, vowed that family members are determined to find out why Philip died.

"I can guarantee you, we will get to the bottom of this,"

said the elder Coleman, who works as a state parole supervisor.

Philip Coleman, a graduate of Morgan Park High School and the University of Chicago who was involved in running a local restaurant, wasn't a troublemaker, his relatives said.

Neighbor Dana Robinson, though, said Coleman was acting strangely just before he was arrested — including talking loudly to himself, hurling himself into a barbed wire fence and barging into Robinson's garage.

Coleman's behavior was totally out of character, said Robinson, 50.

"I've never seen him out of sorts," said Robinson, who said he talked periodically in the quiet neighborhood with Coleman. "I've always seen him laughing, always seen him smiling. Everything was always good with him."

Robinson said at one point, he started to shut his overhead garage door to keep Coleman out but Coleman dropped to the ground and

rolled inside just before the door closed, Robinson said.

Later, Coleman bolted from the garage, then cut his hands trying to climb the wire fence, Robinson said.

Robinson said moments later he watched as Coleman confronted his own father, then struck him in the head with his open hand.

Relatives would say little about why Coleman was behaving strangely.

"He had a breakdown and he was not treated right. He didn't deserve to die," said Jacqueline Coleman, declining to comment further.

A spokesman for the Independent Police Review Authority said the agency is in the early stages of an investigation but declined to comment further.

Police consider Tasers a non-lethal option but the devices have generated controversy because some people have died after they were shocked by them.

**Contributing:** *Allison Horton, Michael Lansu, Brian Slodysko and Rich Hein*